# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff/Respondent,

v.

POLLY HOPPER,

     Defendant/Petitioner.

Cr. No. 14-2130 KG/KK
(Civ. No. 18-137 KG/KK)

## MAGISTRATE JUDGE'S
## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Defendant/Petitioner Polly Hopper's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, (Doc. 281) filed on February 6, 2018.  The Government responded in opposition to the Motion on June 22, 2018.  (Doc. 293.)  And Ms. Hopper filed a reply on July 11, 2018.  (Doc. 294.)  United States District Judge Kenneth Gonzales referred the case to me pursuant to 28 U.S.C. §§ 636(b)(1)(B), (b)(3) and *Va. Beach Fed. Sav. & Loan Ass'n v. Wood*, 901 F.2d 849 (10th Cir. 1990), on December 11, 2018.  (Doc. 312.)

The Court has meticulously reviewed all of the pleadings and attachments in this civil proceeding and the record in the underlying criminal case. Because the Petition, exhibits, and record conclusively establish that Ms. Hopper is not entitled to relief, an evidentiary hearing is unnecessary. 28 U.S.C. § 2255(b); *United States v. Flood*, 713 F.3d 1281, 1291 (10th Cir. 2013); *United States v. Kennedy*, 225 F.3d 1187, 1193 (10th Cir. 2000). Having carefully considered the parties' submissions, the civil and criminal record, and the relevant law, the Court recommends that Ms. Hopper's Motion be DENIED.

# I.    Background

## A.  Factual Background

Defendant/Petitioner Polly Hopper ("Ms. Hopper") was convicted of kidnapping and conspiracy to commit kidnapping based on her involvement in the kidnapping of Melissa Hopper. (Doc. 185); *see also United States v. Hopper*, 663 F. App'x. 665, 666-67 (10th Cir. 2016) (unpublished). The following background information is derived from the evidence presented at Ms. Hopper's trial and from the Tenth Circuit's Opinion affirming Ms. Hopper's conviction.

The victim in this case, Melissa Hopper, is the estranged wife of Ms. Hopper's nephew and co-defendant, Jessie Hopper Jr. In March or April 2014, after Melissa and Mr. Hopper Jr. separated, Mr. Hopper Jr. moved from Arkansas to Deming, New Mexico, to live with his grandmother Patsy Lee Hopper (hereinafter "Patsy Lee"), his father Jessie Hopper Sr., and his aunt Ms. Hopper. (Doc. 252 at 81.) *Hopper*, 663 F. App'x. at 667. The Hopper property contained a trailer in which Ms. Hopper lived with Patsy Lee, and a bus in which the two Hopper men lived together. (Doc. 253 at 203-04.) Mr. Hopper Jr. described Mr. Hopper Sr. as "the boss" of the Hopper household. (Id. at 210.) When Mr. Hopper Jr. learned that Melissa had a boyfriend, he talked with his father who said that it "wasn't right" for Melissa to have a boyfriend, that she needed to be with Mr. Hopper Jr., and that his children should not be calling another man "Daddy." (Id. at 207-08.) Mr. Hopper Sr. came up with a plan to kidnap Melissa, and in a subsequent discussion on this topic that same day, Ms. Hopper joined the scheme, with the two of them telling Mr. Hopper Jr. to "[w]atch and learn, . . . we're going to show you how to get your kids and your wife." (Id. at 208; 209-10.) As to their respective motivations for kidnapping Melissa, Mr. Hopper Jr. testified that he was motivated by his wish to be with his children; his father wanted sex with

Melissa; and Ms. Hopper wanted to make her brother happy and to "torture" Melissa, whom she hated. (Id. at 209, 323.)

Ms. Hopper, Mr. Hopper Sr. and Mr. Hopper Jr. (collectively, "the Hoppers") had several discussions regarding their plan to kidnap Melissa. (Id. at 212.) Because the Hoppers' only form of transportation was a truck in which only three people could fit, their plan to kidnap Melissa and the children required the purchase of a van. (Id. at 215-16.) A calendar kept by Ms. Hopper indicated that on May 6th the Hoppers would "go look for van," and on May 7th they would leave for Arkansas. (Id. at 215.) Consistent with the calendar notation, Ms. Hopper, Mr. Hopper Sr., and Patsy Lee[1] went shopping for the van on May 6th. (Id. at 216-17.) Mr. Hopper Jr., who had agreed that the van should be purchased, stayed behind because he could not fit in the truck. (Id. at 216.) Janice Peterson, the used car sales person who sold the minivan that the Hoppers ultimately used to kidnap Melissa, testified that she understood that the Hopper family needed a minivan with three-row seating because they were going to take a trip to Arkansas and they needed to transport their grandchildren. (Doc. 256 at 61-63.)

Before they left New Mexico, Mr. Hopper Jr. called Melissa to tell her that Ms. Hopper had died. (Doc. 253 at 211; Doc. 252 at 81.) The purpose of this ruse was to assure that Melissa, who did not like Ms. Hopper, would agree to meet him once the Hoppers were in Arkansas. (Doc. 253 at 211.)

Again, consistent with Ms. Hopper's calendar notation, the Hoppers departed for Arkansas on May 7th. (Doc. 253 at 217.) They arrived in Arkansas on May 8th. (Id.) Once in Arkansas, the Hoppers went first to a town called Morrilton where Ms. Hopper retrieved the title to the Hoppers' truck and some money from a pawnshop broker. (Id. at 218-19.) Ms. Hopper had paid for the gas

---

[1] The purchase of a van was also intended to benefit Defendant's mother for whom the truck presented difficulty. (Doc. 253 at 215.)

on the trip to Arkansas, and the money that she collected from the pawnshop broker was supposed to be used for gas on the return trip to Deming. (Id. at 219-20.) The Hoppers refueled the minivan before travelling to Hot Springs (the town in which Melissa lived) because they knew that once they got Melissa in the van, they would promptly leave Arkansas. (Id. at 220; Doc. 252 at 69.)

After reaching Hot Springs, the Hopper men dropped Ms. Hopper off at a park so that Melissa, who was under the impression that Ms. Hopper was dead, would not see her. (Doc. 253 at 226.) Mr. Hopper Jr. then called Melissa to tell her that he was in town and that he wanted to see his children. (Doc. 253 at 226-27.) Although she hesitated at first, Melissa, along with her boyfriend and the children eventually went to the park to meet Mr. Hopper Jr. (Doc. 253 at 227-28; Doc. 252 at 76-77.) After playing with his children, Mr. Hopper Jr. showed Melissa the van and told her that it was a gift for her and the children. (Doc. 253 at 228; Doc. 252 at 77-78.)

Melissa was "a little" surprised to see Mr. Hopper Sr., who had stayed near the van while Mr. Hopper Jr. played with the children, but Mr. Hopper Sr. told Melissa that his dad wanted to talk to her about something "kind of serious" so Melissa got in the van to talk to him. (Doc. 252 at 78.) Mr. Hopper Sr. told Melissa that he was dying from cancer, and that he wanted to spend time with his grandchildren. (Doc. 252 at 78-79.) Mr. Hopper Sr. then invited Melissa and the children to join the Hopper men for dinner, and she accepted the invitation. (Doc. 252 at 79.)

Before going out for dinner, Melissa needed to change her clothes and get a diaper for one of her children, so the Hopper men followed Melissa and her boyfriend home and waited for her to get ready. (Doc. 252 at 79.) Leaving her boyfriend at home, Melissa and her children joined the Hopper men in the minivan believing that the group would have dinner at a nearby restaurant. (Id. at 80.) Unbeknownst to Melissa, the dinner invitation was merely a ruse to get her and the children into the van. (Doc. 253 at 230-31.)

When Melissa observed that they had made a wrong turn and were not headed in the direction of a restaurant, Mr. Hopper Sr. pulled out a sawed-off shot gun and handcuffs and instructed his son to handcuff Melissa. (Doc. 253 at 231, 237-38.) Mr. Hopper Sr. told Melissa, who was screaming, to shut up and he threatened to kill her if she caused a scene, and Mr. Hopper Jr. put the gun in Melissa's face to assure her compliance. (Id. at 238; Doc. 252 at 85.) Mr. Hopper Sr., who was driving the van, returned to the place where Ms. Hopper was hiding and picked her up. (Doc. 253 at 239.) According to Mr. Hopper Jr., when Ms. Hopper got into the van, Melissa said "I'm going to kill you, Bitch." to which Ms. Hopper responded "You're not going to get the chance. Got you now." (Id. at 239.) According to Melissa, Ms. Hopper got into the van and gave her a "weird eerie smile" and said, "They got you." (Doc. 252 at 82.)

The Hoppers immediately left Arkansas and headed for New Mexico. (Doc. 253 at 240.) On the return trip, the Hoppers allowed Melissa out of the van only to go to the restroom (once at a Sam's Club store and once at a Walmart), and only then when she was accompanied by Ms. Hopper. (Doc. 253 at 243-44; Doc. 252 at 96.) At one point along the way, Melissa and Ms. Hopper were left alone in the van while the Hopper men were in Walmart. (Doc. 252 at 103.) Melissa testified that while they were alone in the van, she asked Ms. Hopper why she would not let her go, to which Ms. Hopper responded, "[b]ecause JJ wanted you." (Id.)

When they reached the Hopper property in Deming on May 9th, Mr. Hopper Sr. forced Melissa into the bus residence. (Doc. 253 at 247-48.) Mr. Hopper Sr. told Melissa that the "rules" were that she would clean the house, take care of the kids, and give him sex. (Doc. 253 at 248.) Mr. Hopper Sr. forced Melissa to wear a nightgown that he had purchased for her when the Hoppers stopped at Walmart and, over the course of the ensuing 24 hours, both Hopper men repeatedly raped Melissa who was, at times, kept handcuffed to Mr. Hopper Sr.'s bed. (Id. at 249-

56; Doc. 252 at 104-13.)  At Melissa's request, Ms. Hopper brought her some clothes to wear because the nightgown was revealing, and Melissa did not want her son to see "everything" when she bent over.  (Doc. 252 at 113-14.)  Otherwise, according to Melissa, Ms. Hopper "went about her daily routine."  (Id. at 114.)  Melissa stayed inside the bus because she was not allowed to go outside.  (Id. at 116.)

At the inception of the kidnapping, when got into the minivan with her children, Melissa had her phone.  (Doc. 252 at 90.)  According to Melissa's testimony, Mr. Hopper Jr. took the phone away from her once she was in the van, but he gave it back to her and instructed her to call members of her family in Arkansas to tell them that she was with the Hoppers because she wanted to be with her husband and that she was not being kidnapped, and once she had made those calls, he took the phone away from her and removed the battery so that Melissa could not receive incoming calls.  (Doc. 252 at 90-92.)  According to Mr. Hopper Jr.'s testimony, although he eventually took her phone from her, Melissa had her phone for most of the trip, including while they were inside Sam's club, and she was free to make phone calls as she pleased. (Doc. 253 at 300-07.)  According to Melissa's testimony, once they were in Deming on the Hopper property, Mr. Hopper Jr. gave her phone to her and instructed her, again, to call her Arkansas family to say that everything was fine.  (Doc. 252 at 116.)  According to Melissa, Mr. Hopper Jr. took the phone away from her and removed the battery after every phone call she made.  (Doc. 252 at 92.)

On May 9th, three of Melissa's cousins called 911 to report that Melissa and her children had been taken by the Hopper men.  (Doc. 256 at 48-49.)  Arkansas police ascribed some urgency to the situation and began an investigation.  (Doc. 256 at 50.)  As part of this investigation, they made a "ping" request through Melissa's cellphone company.  (Doc. 256 at 53.)  A ping signal from Melissa's cell phone indicated that she was on the Hoppers' property in Deming New

Mexico.  (Id. at 53, 55.)  On May 10th, Arkansas police contacted the New Mexico State Police to ask for assistance.  (Id. at 56-57.)  In response, to what they understood to be a "possible kidnapping," New Mexico State Police Officer Michael Thomas, and his fellow officer, Sergeant Sosa went to the Hoppers' residence.  (Doc. 252 at 20-23.)  The officers' first encounter was with Mr. Hopper Sr.  (Doc. 252 at 26-27.)  Mr. Hopper Sr. conceded that Melissa was present on the Hopper property and agreed to let the officers talk to her to check on her welfare.  (Doc. 252 at 27.)  Mr. Hopper Sr. took the officers to the bus and called for Melissa to come out.  (Doc. 252 at 28.)  Initially, in the presence of the Hopper men, Melissa assured the officers that she was fine. (Doc. 252 at 28.)  However, once Officer Thomas managed to remove Melissa from the men's presence and engage her in a private conversation, she related to him that she had been kidnapped and that she was scared.   (Doc. 252 at 28; 34-35.)  Ultimately, the officers detained the Hoppers and brought Melissa and her children to a women's shelter.  (Id. at 38, 40.)

### B.  Procedural History

On June 18, 2014, Ms. Hopper along with Mr.  Hopper Sr., and Mr. Hopper Jr., were charged with crimes related to Melissa's kidnapping.  (Doc. 43.)   Count 1 and Count 2 of the six-count indictment related to Ms. Hopper.  (Doc. 43.)  In Count 1, Ms. Hopper was charged with conspiracy to commit kidnapping contrary to 18 U.S.C. § 1201(a)(1); and in Count 2 Ms. Hopper was charged with kidnapping and aiding and abetting a kidnapping contrary to 18 U.S.C. 1201(a)(1) and 2. (Doc. 43 at 1-2.)  Mr. Hopper Jr. pleaded guilty to five counts in the indictment and agreed to testify at trial on behalf of the Government.  (Doc. 112; Doc. 115.)  Ms. Hopper and Mr. Hopper Sr. were tried together before a jury in a trial that commenced on February 23, 2015. (Doc. 256.)  Ms. Hopper was represented at trial by Court-appointed counsel, Russell Dean Clark.

(Doc. 293-1 at 1.) On February 27, 2015, the jury returned its verdict finding Ms. Hopper and Mr. Hopper Sr. guilty of the charges against them in the indictment. (Doc. 184.)

Ms. Hopper was sentenced to concurrent terms of imprisonment of 292 months imprisonment as to each of Counts 1 and 2. (Doc. 212 at 3.) Ms. Hopper appealed her conviction and sentence to the Tenth Circuit Court of Appeals. *Hopper*, 663 F. App'x. 665. On appeal, Ms. Hopper argued that: (1) the district court abused its discretion in refusing to sever her trial from that of her co-defendants; (2) there was insufficient evidence to support her conviction for conspiracy to commit kidnapping; (3) there was insufficient evidence to support her conviction for kidnapping; and (4) her sentence was substantively unreasonable. *Id.* at 669. Rejecting each of Ms. Hopper's arguments, the Tenth Circuit affirmed her conviction and sentence. *Id.* at 673.

In the Motion presently before the Court, Ms. Hopper argues: (1) that her trial counsel was ineffective for failing to present certain witnesses at trial to support her claim of innocence (Doc. 281 at 4, 6); (2) that her trial counsel was ineffective because he induced her to reject the government's proffered plea bargain offers (Doc. 281 at 5); and (3) that she is actually innocent of the crimes for which she was convicted. (Doc. 281 at 8.) The Court considers each of these claims in turn.

## II.     <u>Standard of Review</u>

Pursuant to 28 U.S.C. § 2255, a federal prisoner who

> claim[s] the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). Relief is available under Section 2255 only if "the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." *United States*

*v. Addonizio*, 442 U.S. 178, 185 (1979) (internal quotation marks and citation omitted) (superseded by statute on other grounds). The court must presume "that the proceedings leading to the conviction were correct"; the burden is on the movant to demonstrate otherwise. *Klein v. United States*, 880 F.2d 250, 253 (10th Cir. 1989) (citing *United States v. Morgan*, 346 U.S. 502, 512 (1954)).

### III. <u>Analysis</u>

#### A. <u>The Law Governing an Ineffective Assistance of Counsel Claim</u>

The Sixth Amendment to the Constitution guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.* at 687. Thus, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. This requires showing (1) that counsel's performance was so deficient that it fell below the objective standard of reasonableness, such that counsel "was not functioning as the 'counsel' guaranteed by the Sixth Amendment"; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687, 694. The Court's inquiry into counsel's effectiveness must be based on its consideration of all the circumstances and from counsel's perspective at the time of the alleged error, and this standard is highly deferential. *Id.* at 688-89 (recognizing that counsel must have "wide latitude" to make tactical decisions).

#### B. <u>Ms. Hopper's Claim That Her Counsel Was Ineffective For failing to Present Certain Witnesses at Trial</u>

Ms. Hopper argues that her trial counsel was ineffective because he "fail[ed] to present fact/[a]libi witnesses at trial" or to do an independent investigation. (Doc. 281 at 4.) Ms. Hopper's

argument in this regard is presented in two parts. In the first part, Ms. Hopper argues that she had an innocent and plausible reason for travelling to Arkansas—namely to conduct business with a pawnshop broker named Ed. (Doc. 281 at 4; Doc. 294 at 1.) She argues that her counsel was ineffective because he failed to investigate this line of defense and failed to call Patsy Lee and Ed to testify that her business with Ed was the actual reason that she travelled to Arkansas. (Doc. 281 at 4, 294 at 1). In the second part, Ms. Hopper argues that her counsel should have called Patsy Lee to testify that the Hoppers purchased the minivan, not for the purpose of kidnapping Melissa, but for the innocent purpose of providing Patsy Lee with comfortable transportation. (Doc. 281 at 6; Doc. 294 at 3.)

1. **Ms. Hopper Has Not Demonstrated that Mr. Clark's Decision to Not Call Patsy Lee and Ed to Testify Fell Below an Objective Standard of Reasonableness**

Inherent in the reasonableness standard established in *Strickland*, is counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In determining what to investigate, counsel should converse with the defendant and rely on information supplied by her. *Id.* "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices" made after an investigation into plausible lines of defense must be respected and "will seldom if ever be found wanting." *Id.* at 681. "[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney[.]" *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008).

In an affidavit submitted as an attachment to the Government's Response to Ms. Hopper's motion her trial counsel, Mr. Clark, discussed his decision to not call Patsy Lee and Ed to testify. According to Mr. Clark, Ms. Hopper suggested that he call Patsy Lee to testify as an alibi witness. (Doc. 293-1 at 2.) Accordingly, Mr. Clark and his investigator travelled to the Hopper residence

and interviewed Patsy Lee. (Id. at 3.) Among other things, Mr. Clark asked Patsy Lee about Ms. Hopper's purpose for travelling to Arkansas with her brother and her nephew. (Id.) According to Mr. Clark, Patsy Lee told him that before Ms. Hopper and the Hopper men departed, Ms. Hopper told her to "make room for the boys" (a reference to Melissa and Mr. Hopper Jr.'s children) because they would be bringing them back to New Mexico. (Id.) Weeks later, Mr. Clark called Patsy Lee to test her memory on this subject. (Id.) In his affidavit, Mr. Clark relates that in this second conversation, Patsy Lee "made clear" that before departing for Arkansas, Ms. Hopper told her to "make room for the boys" because they—Ms. Hopper, and the Hopper men, were bringing them back. (Id.) Based on these discussions, Mr. Clark made a strategic decision not to call Patsy Lee to testify. (Doc. 293-1.) Mr. Clark explained his reasoning as follows:

> First [Patsy Lee's] anticipated testimony would strengthen the government's case and contradict Ms. Hopper's defense theory. [Patsy Lee's] anticipated testimony would bolster the government's position that [Ms. Hopper] knew the purpose of the trip to Arkansas was to pick up the title to her pick up *and pick up the boys as well*. I had reason to believe that [Patsy Lee's] testimony would benefit the government's arguments that [Ms. Hopper] had knowledge that the purpose of purchasing the van and traveling to Arkansas was to kidnap Melissa and take the kids. Second, I acknowledged that [Patsy Lee's] testimony would do nothing to rebut the governments' evidence. Third, the government could have impeached [Patsy Lee] as a witness based on her relationship with [Ms. Hopper]. In sum, I chose not to call [Patsy Lee] as a witness because I perceived her intended testimony as a detriment rather than a benefit to [Ms. Hopper's] case.

(Doc. 293-1 at 3-4.)

Mr. Clark's affidavit also addresses his decision to not call Ed to testify. According to Mr. Clark, prior to trial he and Ms. Hopper discussed any additional witnesses that might be helpful to the defense. (Doc. 293-1 at 4.) Ms. Hopper suggested that Mr. Clark call "the man" from Arkansas who held the title to her truck. (Id.) Although Ms. Hopper did not know the name of the man, she mentioned that he owned a pawn shop, and she mentioned, further, that he could be called to testify that she went to Arkansas to pick up the title to the truck. (Id.) Mr. Clark investigated the matter

and learned that the man's name was Ed. (Id.) Mr. Clark decided not to call Ed to testify because he planned to elicit testimony from Mr. Hopper Jr. that when Ms. Hopper and the Hopper men were making plans to travel to Arkansas, the idea was to retrieve the title to the pickup truck from Ed. (Id.) Mr. Clark reasoned that "[t]here was no need to call Ed because one of the government's 'star witnesses', Jessie Hopper [Jr.], provided the favorable information Ed could have provided." (Id.)

In summary, the record reflects that Mr. Clark discussed the matter of potential defense witnesses with Ms. Hopper who suggested calling Patsy Lee and "the man from Arkansas" who had held the title to her truck. Mr. Clark interviewed Pasty Lee in person, and two weeks later, he interviewed her over the phone, confirming that her version of the facts remained unchanged. Further, Mr. Clark, equipped only with a vague reference to "the man from Arkansas" investigated sufficiently to learn the man's identity[2] and to confirm that Ms. Hopper had retrieved the title to her pickup truck from him during the at-issue trip to Arkansas. Based on the foregoing, Mr. Clark clearly satisfied his duty to make a reasonable investigation into Ms. Hopper's "fact/alibi" witnesses; Ms. Hopper's argument to the contrary lacks merit.

Having made these investigations, Mr. Clark concluded that Pasty Lee's testimony would have been detrimental to the defense; and Ed's testimony was unnecessary considering Mr. Hopper Jr.'s willingness to testify regarding Ms. Hopper's business with Ed. Based on these considerations, and in an exercise of his reasonable and sound professional judgment, Mr. Clark determined not to call Pasty Lee and Ed to testify. The Court will not second-guess these decisions. *Strickland*, 466 U.S. at 689 (admonishing courts to avoid second-guessing counsel's defense after it has proved unsuccessful).

---

[2] The trial transcript reveals that Defendant's counsel had information that Ed's full name was "Ed Mitchell." (Doc. 253 at 318.)

Based on Mr. Clark's affidavit, the relevant portions of which are variously supported by the record and uncontroverted by Ms. Hopper, the Court concludes that Ms. Hopper has failed to satisfy the *Strickland* "reasonableness" test relative to Mr. Clark's investigation of the usefulness of Patsy Lee and Ed's testimony or his strategic decision to forego their testimony.

## 2. Ms. Hopper Has Not Demonstrated Prejudice Arising from the Omission of Patsy Lee and Ed's Testimony

Even if Ms. Hopper had succeeded in demonstrating that Mr. Clark's decision to not call Patsy Lee and Ed to testify in her defense was so deficient that it fell below the objective standard of reasonableness, she would not be entitled to habeas relief because she cannot demonstrate that the result of the proceeding would have been different had these witnesses testified.

### a. The Jury Was Apprised of Ms. Hopper's Innocent "Plausible Reason" for Travelling to Arkansas

Ms. Hopper argues that Ed and Patsy Lee's testimony would have demonstrated that her business dealing with Ed constituted an innocent and plausible reason for Ms. Hopper's trip to Arkansas, unrelated to kidnapping Melissa, and that evidence of this reason was not otherwise presented to the Court or to the jury. (Doc. 281 at 4.) This argument is contradicted by the record.

Mr. Hopper Jr. testified on direct examination that the Hoppers' plan once they reached Arkansas "was to go and handle some business that [Ms. Hopper] had at Morrilton" before travelling to Hot Springs to pick up Melissa and the children; that this business entailed checking on "stuff" that she had left in Morrilton with "the dude that used to run the pawnshop"; and that the Hoppers in fact travelled to Morrilton where Ms. Hopper got the title to the pickup truck and money from the pawnshop broker. (Doc. 253 at 218-20.) On cross examination by Mr. Hopper Sr.'s counsel, Mr. Hopper Jr. confirmed that Ms. Hopper "[h]ad some business to handle in Arkansas" that required her to go to a pawn shop, and that Ms. Hopper in fact handled this business

in Morrilton before the Hoppers went to Hot Springs. (Doc. 253 at 289-91.) And, again, on cross-examination by Mr. Clark, Mr. Hopper Jr. reiterated these facts—specifically confirming, among other facts, that when the Hoppers were planning their trip to Arkansas, one of their purposes was "to go down there for Polly" because she had left "some stuff with a man that had a pawnshop." (Doc. 253 at 318.) Further, Mr. Clark succeeded in admitting the title into evidence during his cross-examination of Mr. Hopper Jr., confirming via Mr. Hopper Jr.'s testimony that Ms. Hopper had, in fact, retrieved the title from Ed on the Hoppers' trip to Arkansas. (Doc. 253 at 321-22.) Thus, the record reflects that the jury had ample opportunity to consider the fact that Ms. Hopper, personally, had an innocent reason unrelated to the kidnapping scheme to travel to Arkansas—namely to conduct business with Ed.

It is not reasonable to assume that the outcome of the trial would have been different had Patsy Lee and Ed testified. Ms. Hopper does not argue, nor does the evidence of record suggest, that Ed was privy to the Hoppers' activities in Deming or Hot Springs such that he was positioned to testify about Ms. Hopper's purpose for travelling to Arkansas. To the extent that Ed could have testified regarding the timing or nature of his business with Ms. Hopper, this evidence was presented through the testimony of Mr. Hopper Jr. To the extent that Patsy Lee may have testified that Ms. Hopper's business with Ed led her to Arkansas, Ms. Hopper does not controvert Mr. Clark's assertion that Patsy Lee would also have testified that Ms. Hopper, at the very least, knew that the trip to Arkansas also involved retrieving Melissa's children.

Furthermore, ample evidence at trial demonstrated that Ms. Hopper's trip to Arkansas was motivated, not only by her business with Ed, but also by her involvement in the kidnapping scheme. Summarized, this evidence included Mr. Hopper Jr.'s testimony that Ms. Hopper was involved in planning the kidnapping before the Hoppers left Deming; that the plan once the

Hoppers reached Arkansas was to travel to Morrilton first so that Ms. Hopper could do business with Ed before the Hoppers "pick[ed] up" Melissa and the Children[3]; that in furtherance of the ruse that she had died, Ms. Hopper hid nearby while the Hopper men coaxed Melissa into the minivan; that when the Hoppers had Melissa handcuffed in the minivan they retrieved Ms. Hopper from her hiding place and Ms. Hopper taunted Melissa by saying "Got you now"; and that on the return trip to Deming, Ms. Hopper accompanied Melissa to the restroom to ensure that Melissa would not talk to anyone. (Doc. 253 at 208, 215, 218, 238-39, 244-45.) Evidence of Ms. Hopper's participation in the kidnapping was also presented through Melissa's testimony that once she was handcuffed in the minivan, Ms. Hopper got in the van and gave her a "weird eerie smile" and said, "They got you"; that en route to Deming, Ms. Hopper accompanied her to the restroom and asked her whether she had talked to anybody; and that at one point on the return trip when Melissa and Ms. Hopper were alone in the minivan, Melissa asked Ms. Hopper why she wouldn't let her go, and Ms. Hopper responded, "Because JJ wanted you." (Doc. 252 at 82, 96, 103.)

### b. **The Jury Was Apprised of Evidence That the Hoppers' Purchase of the Minivan was Partially Motivated by Patsy Lee's Transportation Needs**

Ms. Hopper also argues that she was prejudiced by Mr. Clark's decision to not call Patsy Lee to testify regarding the Hoppers' reason for purchasing the minivan. (Doc. 281 at 6.) Again, this argument is contradicted by the record. Mr. Hopper Jr. testified that the Hopper family purchased the minivan, not only to transport Melissa and the Children to Deming, but also for Patsy Lee's benefit. (Doc. 253 at 215.) To that end, Mr. Hopper Jr. testified that the Hopper family purchased the van "[s]o we could pick up my family. And my grandma, she wanted a van because [the] truck's hard for her to get up and out of and the van's easier for her. And she can

---

[3] Ed's residence and the pawnshop were in Morrilton and the children lived with Melissa in Hot Springs— approximately two and half hours away. (Doc. 253 at 218-20.)

drive the van, she can't drive the truck." (Doc. 253 at 215.) In sum, the evidence at trial was such that the jury was aware that the minivan purchase was motivated not exclusively by the Hoppers' kidnapping scheme, but also for the innocent reason of accommodating Patsy Lee's need for manageable transportation. For this reason, and for the reasons discussed in the previous section, it is not plausible to conclude that the jury's verdict would have been different had Pasty Lee testified about the Hoppers' reason for purchasing the minivan.

## C. Ms. Hopper's Argument that Her Counsel was Ineffective For Inducing Her to Not Plead Guilty

Ms. Hopper asserts that Mr. Clark failed to properly advise her regarding a plea offer the Government made and unduly influenced her to reject a favorable plea offer. (Doc. 281 at 5.) Specifically, Ms. Hopper argues that:

> Prior to trial, the government offered a plea. Mr. Clark induced me not to plead guilty. He told me that I would not go to prison. [Mr. Hopper Jr.] agreed to plead guilty of everything and he agreed to say that he was guilty of the offense charged to take the 25 years offered by the government. The government, not having 'enough evidence' to [substantiate] the counts against [me], offered [me] 5 years (total)[.] It was wrong for the attorney not to do what's in the best interests for his client. I would not have gone to trial.

(Doc. 281 at 5.) Ms. Hopper also maintains that she had never seen the "written" plea offer until it was submitted as an attachment to the Government's Response. (Doc. 294 at 1.)

Contrary to Ms. Hopper's assertions, the record reflects that the Government never offered a plea agreement that contemplated an agreed upon five-year sentence. Rather, on August 27th, 2014, the Government formally offered Ms. Hopper the only written plea offer made in this case, in the form of a Rule 11(c)(1)(C) plea agreement providing that in exchange for her pleas of guilty to both counts against her, the parties would stipulate pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that "the appropriate sentence in this case falls within the range of seventeen

(17) to twenty-two (22) years."[4] (Doc. 293-2 at 6.) The factual basis of the plea agreement required Plaintiff to specifically admit and declare under penalty of perjury that the following facts were true and correct:

> On May 8, 2014, my codefendants and I kidnapped the victim, identified as Jane Doe in the Indictment, in Hot Springs, Arkansas and brought her against her will to Deming, New Mexico. My codefendants and I agreed to do so prior to that date.

(Id.) According to Mr. Clark, because Ms. Hopper cannot read, he read the plea agreement offered to her word for word, discussed with her the pros and cons of accepting the plea offer, explained that she did not have to accept the plea offer and made sure that she understood the terms of the plea agreement and its advantages and disadvantages. (Doc. 293-1 at 1-2.) Mr. Clark has further testified under oath that after advising Ms. Hopper of the plea offer, "she flatly turned it down, insisting that she was not going to plead guilty to something she did not do."[5] (Id. at 2.) According to Mr. Clark, Ms. Hopper considered the seventeen to twenty-two years sentencing range "to be

---

[4] The Government's proffered plea agreement erroneously stated the maximum penalties for Count 1, the Conspiracy to commit kidnapping charge, as imprisonment for a period of not more than five (5) years with a mandatory term of supervised release of up to three years. (Doc. 293-2 at 4.) In fact, the maximum penalty for the conspiracy to commit kidnapping crime for which Ms. Hopper was charged is any term of years up to life and a mandatory term of supervised release of not more than five years that must follow any term of imprisonment. 18 U.S.C. § 371; 18 U.S.C. § 1201(a)(1) and (c); 18 U.S.C. §3583(b)(1). Despite this erroneous statement of penalties, the plea agreement clearly and unequivocally provided a stipulated sentencing range of no less that seventeen and no more than twenty-two years of imprisonment, and nowhere did it suggest, as Ms. Hoppers now asserts, that the Government offered her an 11(c)(1)(C) with a five-year maximum sentencing term in exchange for her pleas of guilty to the charges against her.

[5] During Ms. Hopper's discussions with Mr. Clark concerning the Government's plea offer, and when professing her innocence as to the conspiracy and kidnapping crimes for which she was charged and convicted, Mr. Clark states that Defendant also discussed her claimed lack of knowledge concerning the plan to bring the boys back to New Mexico. (Doc. 293-1 at 2.) The Government's plea offer understandably did not require Ms. Hopper to admit to kidnapping the boys as neither she nor her co-defendants (one of whom was their father) were charged with kidnapping them, but Ms. Hopper apparently equated her professed lack of knowledge concerning the plan involving the boys with her innocence of, and the Government's inability to prove her guilt beyond a reasonable doubt, as to the conspiracy and kidnapping/aiding and abetting counts involving the boys' mother. Mr. Clark has attested that he believed that evidence of Ms. Hopper's knowledge of the plan to bring the boys back to New Mexico "would have made her conviction a near certainty." (Doc. 293-1 at 3). And indeed there was testimony at trial contradicting Ms. Hopper's claimed lack of knowledge concerning the plan to bring the boys back to New Mexico. In any event, I agree with the Tenth Circuit and am independently convinced based on my exhaustive review of the entire record, that there was ample and sufficient other evidence upon which any rational factfinder could determine that Ms. Hopper was a member of the charged kidnapping conspiracy and guilty of kidnapping and aiding and abetting the kidnapping of Melissa. See United States v. Hopper, 663 Fed. Appx. at 670, 671.

the same as a life sentence." (Id. at 2). Mr. Clark asserts that he revisited the Government's plea

offer with Ms. Hopper on or about December 20, 2014 advising her that Hopper Jr. had pled guilty

and would most likely testify against her with devastating effect, but that she again claimed

innocence and rejected the plea offer. (Id.) Mr. Clark "subsequently advised the government of

[Ms. Hopper's] rejection of the plea offer." (Id.)

On February 23, 2015, the day that Ms. Hopper's trial began, after the jury had been

empaneled and seated in court, but before it was sworn, counsel for the parties asked to approach

the bench where they indicated that after sitting through voir dire, the Defendants wanted to

explore a possible plea resolution. (Doc. 246 at 17.) The following bench conference exchange

occurred:

> MR. SCHYDLOWER [Counsel for Hopper Sr.]: You Honor, plea negotiations have
> been ongoing for some time. I think the events of this morning have registered with [Mr.
> Hopper Sr.] and he has instructed me to make a proposal to the government to resolve this
> case. I've communicated it to the government, and I believe there is a necessity for the
> government to confer with the supervisor. And the government has indicated a desire to
> speak directly with my client. I know time is golden in this case, but I wonder whether it
> might be an investment to resolve the matter if the court might be inclined to allow full
> negotiations with the parties?
>
> This is not a last-minute deal. This is something my client has instructed me to pursue after
> he watched the voir dire on his own. And I'm respectfully asking the court, although I
> know this is precious time, for some time to allow the government to speak with Mr.
> Hopper to see if a non-trial disposition can be had.
>
> THE COURT: Mr. Clark?
>
> MR. CLARK: I absolutely agree. This is something that came completely – we just
> didn't know about it [until] right after we shut it down in voir dire. You Honor, my client
> called me and said, "I need to talk to you right now." She informed me that there could be
> a possibility of something here and I think it would really serve all of us to at least look
> into it.
>
> THE COURT: Well, Mr. Castellano?
>
> [ASSISTANT UNITED STATES ATTORNEY] MR. CASTELLANO: We're
> certainly willing to listen and would not mind negotiating. We all agree we're short on

time.  We don't want to take much time.  I would ask that if we do this, we do it before we swear the jury because once we swear them, then jeopardy is attached and it could get more complicated.

MR. SCHYDLOWER:    Do you want to talk to them now?

THE COURT:    I'm not going to give you a lot of time.

MR. CASTELLANO:    How about 45 minutes?

THE COURT:    I'm not inclined to 45 minutes.

MR. CASTELLANO:    How about 30 minutes?  Could we do 30 minutes, Your Honor?

THE COURT:    That's a stretch.  How about 20 minutes?

MR. CASTELLANO:    We'll do everything within our power to do it.  We'll also have to talk to the victim, as well, who is in the courthouse downstairs, to make sure that's an acceptable deal to her.  And we are – we acknowledge we're short on time.  We have witnesses lined up.  We will certainly have no shortage of witnesses and we could probably get through a number today, even with the time frame we are looking at.
. . .

THE COURT:    All right.  I'm going to give you 20 minutes, okay?

MR. CASTELLANO:    Understood, Your Honor.

(Doc. 246 at 17-19.)  The Court recessed at 2:17 p.m. so that counsel for the parties and the government could negotiate a possible plea agreement.  (Id. at 23.)  According to Mr. Clark, the Government "floated the possibility of a plea offer to ten years and asked if Ms. Hopper was interested[,]" but that "[a]fter discussing the potential offer with Ms. Hopper, she made clear she was not interested in agreeing to ten years and was adamant about proceeding to trial."  (Doc. 293-1 at 5.) Thus, thirty minutes later, at 2:47 p.m. when Court reconvened, the following discussion occurred in open court, in the presence of Ms. Hooper but outside of the presence of the jury:

THE COURT:    . . . Counsel, where are we?
. . .
MR. CLARK:    Your Honor, we'll be proceeding to trial.

THE COURT:     All right.

. . .

MR. CLARK:     . . . if I could just put something on the record.  The government has entertained a deal.  And after negotiations, my client has knowingly and voluntarily rejected any further plea negotiations.

(Doc. 256 at 4.)   Counsel for the Government further clarified that the plea discussions that had occurred during the recess involved "a package deal, so . . . it's going to be all or none…."  (Id.)  The Court advised the parties that "if there is any amenability, there are still opportunities to pursue it and come to a different outcome or decision.  In the meantime, we will proceed to trial."  (Id. at 4-5.)

A defendant's Sixth Amendment right to counsel extends to the plea-bargaining process.  *Lafler v. Cooper*, 566 U.S. 156, 163 (2012).  "[D]efense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."  *Missouri v. Frye*, 566 U.S. 134, 145 (2012).  Thus, a defense attorney who allows an offer to expire without advising a defendant or allowing her to consider it, renders Constitutionally ineffective assistance of counsel.  *Id.*  Claims of ineffective assistance of counsel during plea negotiations are analyzed pursuant to *Strickland*'s two-part inquiry.  *Id.*  Where, as here, Ms. Hopper's ineffectiveness claim arises from her rejection of a plea offer, she must demonstrate that "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed."  *Id.* at 164.  In considering the foregoing, the court may take into account Ms. Hopper's "expressed willingness, or unwillingness, to accept responsibility for [her] actions."  *Id.* at 171.

Here, Ms. Hopper and Mr. Clark have made conflicting sworn statements concerning their discussions about whether Ms. Hopper should accept or reject the government's written plea offer. On one hand, Ms. Hopper maintains that she never saw the August 27th plea agreement offered to her, and that Mr. Clark induced her to not plead guilty by telling her that she would not go to prison. On the other hand, Mr. Clark maintains that he read the August 27th 11(c)(1)(C) plea agreement to Ms. Hopper, discussed with her the pros and cons of accepting it, and advised her that there was a "very real chance" that she would be convicted at trial and sentenced to a longer term of imprisonment than what was offered in the plea agreement. (Doc. 293-1 at 1-2.) Mr. Clark further states that he again went over the plea offer with Ms. Hopper on or about December 20, 2014 advising her that her nephew had pled guilty and would most likely testify against her "with devastating effect," but "Ms. Hopper again claimed innocence and rejected the plea offer." (Id.) Finally, Mr. Clark maintains that after plea negotiations were resumed on the first day of trial and the Government floated the possibility of a plea offer with a specific ten-year sentence, he discussed this with Ms. Hopper who "made clear she was not interested in agreeing to ten years and was adamant about proceeding to trial." (Id at 5.) The Court cannot assume Mr. Clark's credibility over that of Ms. Hopper. *Milton v. Miller*, 744 F.3d 660, 672 (10th Cir. 2014). Nevertheless, the Court has determined that an evidentiary hearing is unnecessary because even assuming that Ms. Hopper's version of these events is true[6] and that she has satisfied the "reasonableness" aspect of the *Strickland* analysis[7], Ms. Hopper cannot satisfy the prejudice prong of the *Strickland* analysis as discussed below.

---

[6] The Court does not, however, assume as true Ms. Hopper's statement that the Government offered her a plea that contemplated a maximum five-year sentencing agreement, because the record is clear that no such offer was ever made.

[7] *See generally, Lafler*, 566 U.S. at 163 (concluding that the "respondent's counsel was deficient when he advised respondent to reject [a] plea offer on the grounds he could not be convicted at trial").

Pursuant to terms of the 11(c)(1)(C) plea agreement, Ms. Hopper would have been required, among other things, to plead guilty to both crimes against her in the indictment on the ground that she was, in fact guilty; to lay a factual basis and accept responsibility for her criminal conduct; and to acknowledge that the government had sufficient evidence to establish her guilt beyond a reasonable doubt as to each charge.  (Doc. 293-2 at 5-6.)  However, Ms. Hopper has never expressed, and does not now express, willingness to accept responsibility for her role in the conspiracy or kidnapping.  On the contrary, in the present Motion, in her Reply, and in a recently filed motion seeking appointment of counsel Ms. Hopper maintains that she is actually innocent of any wrongdoing.   (Doc. 281 at 6, Doc. 294 at 1-3, Doc. 313 at 1.)  Ms. Hopper continues to deny knowledge of or participation in planning or execution of the kidnapping and she denies that the Government had sufficient evidence to convict her. (Doc. 281 at 4-5, 8; Doc. 294 at 1-3).  Ms. Hopper also variously maintains that each of her co-defendants were solely responsible for the crimes.  (Doc. 281 at 4-6, 8; Doc. 294 at 1-3.)  Furthermore, even while arguing that Mr. Hopper Sr. was "solely guilty," Ms. Hopper suggests that Melissa was not, in fact, a victim of kidnapping. (Doc. 294 at 2.)  These arguments are wholly inconsistent with the notion, advanced by Ms. Hopper, that she would have accepted responsibility, pled guilty to, and established a factual basis for each element of the charges against her.  *Lafler*, 566 U.S. at 171 (holding that the defendant's "expressed willingness, or unwillingness, to accept responsibility for [her] actions" is relevant to the court's consideration of an ineffectiveness claim based on the rejection of a plea agreement); *see Strange v. Sec'y, Dep't of Corrs.*, No. 4:12cv505/RV/GRJ, 2015 WL 3999444, *8 (unpublished) (D. N.D. Fla. June 30, 2015) (concluding that it was unlikely that the petitioner would have accepted a plea throughout his habeas petition he maintained his actual innocence); *Hines v. Ricci*, Civil No. 10-4130 (DMC), 2013 WL 1285290, *21 (unpublished) (D. N.J. Mar. 26,

2013) (stating that a habeas defendant "cannot be heard to complain that he would have accepted the plea offer while maintaining his innocence").

Ms. Hopper also presents a different version of events regarding the plea offer made than is reflected in the record. The Government's policy is that "a plea offer is not effective unless it is made in writing and transmitted by an authorized representative," and that "any discussion regarding the pretrial disposition of a matter that is not reduced to writing and transmitted by an authorized representative . . . does not constitute a 'formal offer' or a 'plea offer,' as those terms are used in <u>Lafler v. Cooper</u>, 132 S.Ct. 1376 (2012), and <u>Missouri v. Frye</u>, 132 S.Ct. 1399 (2012)." (Doc. 293-2 at 2.) And, contrary to Ms. Hopper's assertion that she was offered a plea stipulating to a five-year maximum sentence, the record reflects that the only formal written plea offer was the 11(c)(1)(C) offer to a 17 to 22-year sentencing range. Furthermore, the formal plea offer did not contemplate a nolo-contendre or *Alford* plea which would have allowed her to maintain her innocence.[8] Rather, pursuant to the 11(c)(1)(C) plea offer Ms. Hopper would have been required to plead guilty and admit her criminal liability to both crimes charged against her.

Nor, as Ms. Hopper suggests did the Government make a formal plea offer on the first day of trial. In fact, the parties discussed the possibility of a package plea deal though no such agreement was formalized. Insofar as Ms. Hopper was under the mistaken belief that she was rejecting a formal plea offer that contemplated a five-year maximum agreed upon sentencing term, her silence in open court when Mr. Clark represented in her presence that she "knowingly and voluntarily" rejected any further plea negotiations makes it implausible that she would have instead accepted a plea offer to the ten-years "floated" much less the 17-22 year range formally offered to her in exchange for her admissions of guilt to both counts.

---

[8] *North Carolina v. Alford*, 400 U.S. 25 (1970).

Finally, the Court observes that pursuant to Rule 11(b)(3), before entering a judgment on a guilty plea, "the court must determine that there is a factual basis for the plea." In light of Ms. Hopper's position that she is innocent of the crimes charged, the Court could not have found a factual basis for her pleas of guilty as required by Rule 11(b)(3). In other words, it is not reasonably probable that a court would have accepted Ms. Hopper's guilty pleas in the face of her adamant denial of guilt and her unwillingness to accept responsibility for the crimes with which she was charged and ultimately convicted.

For the foregoing reasons, Ms. Hopper has not demonstrated prejudice, nor could she, arising from her counsel's alleged ineffectiveness during plea negotiations. Ms. Hopper is not entitled to habeas relief on this ground.

### D. **Ms. Hopper's Claim of Actual Innocence**

In her final argument, Ms. Hopper seeks habeas relief on the ground of actual innocence. (Doc. 281 at 8.) Ms. Hopper argues that her nephew—Mr. Hopper Jr. "was guilty and stated he was solely guilty. He stated Polly Hopper was not responsible of any crime charged." (Id.)

To prevail on an actual-innocence claim, Ms. Hopper must show that "it is more likely than not that no reasonable juror would have convicted [her] in light of . . . new evidence presented in [her] habeas petition." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998). A credible claim of actual innocence "must be based on reliable evidence not presented at trial." *Id.* "Given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected." *Id.*

Here, Ms. Hopper has wholly failed to satisfy the foregoing standards. Ms. Hopper has not submitted, nor has she argued the existence of, exculpatory new evidence. Ms. Hopper's conclusory assertion that Mr. Hopper Jr. was solely guilty, and that he stated as much is

contradicted by the record in this case. Even assuming that Mr. Hopper Jr. stated at some time that he was willing to accept sole responsibility in a plea deal or was "solely guilty," substantial evidence of Ms. Hopper's participation in the planning and execution of Melissa's kidnapping, as set forth at length in earlier sections of this recommended disposition, was presented at trial. Viewing the evidence in its totality, the Court cannot conclude that Mr. Hopper Jr.'s purported acceptance of sole responsibility for the conspiracy and kidnapping renders it more likely than not that no reasonable juror would have concluded, on that basis alone, that Ms. Hopper was not guilty of the crimes for which she was convicted.

### E. **Ms. Hopper's Additional Arguments**

In her reply brief, Ms. Hopper presents several new arguments which, broadly speaking, concern (1) whether trial counsel was ineffective for failing to call witnesses to impeach Melissa's credibility; (2) that her counsel was ineffective for failing to call the minivan salesperson as a witness; and (3) whether certain aspects of Melissa and Mr. Hopper Jr.'s testimony was believable. (Doc. 294 at 1-3.) When issues are raised for the first time in a reply brief, the Court may decline to consider them or allow the opposing party to respond in a surreply. *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006); *see United States v. Moya-Breton*, 439 F. App'x 711, 715 (10th Cir. 2011) (stating that ordinarily, issues raised for the first time in a reply brief are deemed waived). Here, however, the Court has reviewed Ms. Hopper's newly raised arguments and has concluded that they lack merit and may be resolved without further briefing.

### 1. **Trial Counsel's Decision to Not Call Witnesses to Impeach Melissa's Credibility**

Ms. Hopper argues that Mr. Clark should have called Melissa's cousin and her first husband to testify that Melissa "took money and gifts for sexual acts" "all the time" and that her first husband gained custody of their two children because she was "unfit to care for children."

(Doc. 294 at 2.)  In Ms. Hopper's view, testimony to this effect would have demonstrated that Melissa was wholly lacking in credibility. (Id.)  This argument does not satisfy either aspect of the *Strickland* analysis.

As to the "reasonableness" inquiry, the Court observes that decisions regarding how best to impeach witnesses and what evidence to introduce is a matter of trial strategy that is entitled to a strong presumption of reasonableness. *Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999) (noting that decisions about how to impeach a witness, what evidence to introduce, and what defense theory is most plausible are matters of trial strategy within the purview of defense counsel); *Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential"; and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy").  The Court will not second-guess the soundness of the professional judgment that led Mr. Clark to forego an attempt to cast doubt upon Melissa's testimony regarding her kidnapping by submitting to the jury that she was an unfit mother or that she exchanged sex for money and gifts.

Setting aside the strategic wisdom of Mr. Clark's decision to not impeach Melissa's credibility on the grounds suggested by Ms. Hopper, two considerations lead the Court to conclude that Ms. Hopper cannot demonstrate prejudice on this ground.  First, substantial evidence against Ms. Hopper was presented through Mr. Hopper Jr., whose testimony, as set forth earlier, evidenced Ms. Hopper's participation in the planning and execution of the kidnapping.

Secondly, the Court is not convinced that the evidence to which Ms. Hopper alludes would be admissible at trial.  Pursuant to Rule 608(b) of the Federal Rules of Evidence, "[e]xcept for a criminal conviction . . . extrinsic evidence is not admissible to prove specific instances of a

witness's conduct . . . to attack or support the witness's character for truthfulness." Ms. Hopper has not shown, nor has she suggested, that Melissa has ever been convicted of any crime, not to mention a crime related to the conduct described by Ms. Hopper. As such even assuming that these purported facts could bear on Melissa's character for truthfulness, the Court is not convinced that such testimony could have survived an admissibility challenge under Rule 608(b).

### 2. Testimony of the Minivan Salesperson

Ms. Hopper argues that Mr. Clark was ineffective insofar as he failed to call "the salesperson at the dealership where the van was bought to get the papers to show that [she] had no responsibility for the ownership of the van and that [Mr. Hopper Sr.] and [Patsy Lee] were purchasing the van." (Doc. 294 at 2.) This argument is wholly lacking in merit because the trial transcript reveals that the salesperson—Ms. Peterson, having been called as a witness for the Government testified to that very effect. According to Ms. Peterson's testimony, Mr. Hopper Sr., Patsy Lee, and Ms. Hopper went to the dealership on May 6th of 2014. (Doc. 256 at 61-62.) Although Ms. Hopper was present, she was not "on the paperwork"; instead, Mr. Hopper Sr. and Patsy Lee conducted the transaction and arranged the financing for the minivan. (Doc. 256 at 65-68.) Mr. Clark cross-examined Ms. Peterson and in so doing, elicited testimony (1) confirming that Mr. Hopper Sr. negotiated the deal, (2) that the financing was arranged in Mr. Hopper Sr.'s and Patsy Lee's names; and (3) that Ms. Hopper was "in no way a part of [the] transaction." (Doc. 256 at 81-83.) In response to Mr. Clark's cross-examination, Ms. Peterson also confirmed that when Ms. Hopper attempted to talk to Ms. Peterson at, she was "instructed" to leave Ms. Peterson alone. (Doc. 256 at 81.) In sum, the jury was fully apprised of the fact that Patsy Lee and Mr. Hopper Sr., not Ms. Hopper, actually purchased the minivan.

### 3. Ms. Hopper's Assertions of Doubtfulness Regarding Portions of Melissa's and Mr. Hopper Jr.'s Testimony

Finally, Ms. Hopper points to discrete portions of testimony that, in her view, established a reasonable doubt as to her guilt of the crimes charged. She maintains that had Mr. Clark "done his job and acted as her attorney and called witnesses" the jury would have picked up on certain discrepancies and the outcome of her trial would have been different. (Doc. 294 at 2.) Specifically, Ms. Hopper points to a portion of Melissa's testimony in which Melissa related that, when she was handcuffed in the minivan one of her sons was "screaming for his daddy to get those bracelets off me." (Doc. 252 at 87-88.) Ms. Hopper argues that this testimony is "highly implausible" given the age of the two boys because she does not "know of any 2 or 4 year old who knows, or c[a]n even speak those words." (Doc. 294 at 1-2.)

Ms. Hopper also points to portions of Mr. Hopper Jr.'s testimony that, in her view, casts doubt on the notion that Melissa had been kidnapped at all. To that end, Ms. Hopper points to Mr. Hopper Jr.'s testimony that for a portion of the trip to Deming, Melissa had access to her phone and was free to use it, including when she went into Sam's Club store. (Doc. 253 at 307.) Mr. Hopper Jr. testified, further, that eventually on the return trip, he took the phone away from her, and then once they were in Deming, he gave the phone back to her.[9] (Doc. 253 at 302-03.) Ms. Hopper argues that because Melissa was "allow[ed] to have a cell phone and to go into a store and freely walk around with that cell phone[,] [t]hat does not sound like a kidnap victim." (Doc. 294 at 2.) Of course, Melissa's testimony regarding the extent to which she had access to her phone differed, in some respects, from Mr. Hopper Jr.'s testimony—for example, Melissa testified that

---

[9] In reference to Melissa's testimony that Mr. Hopper Jr. removed the battery from her phone after each phone call, (Doc. 252 at 92), Defendant also argues that if the battery was taken out of Melissa's cell phone, the police would not have been able to "find her cell by a cell tower." (Doc. 294 at 2.) As noted earlier, both Mr. Hopper Jr. and Melissa testified that, at some point, Melissa used her phone in Deming. (Doc. 253 at 303; Doc. 252 at 172-73.) This call resulted in ping signal from Melissa's cell phone which indicated that she was on the Hoppers' Deming property. (Id. at 53, 55.) The Court discerns no discrepancy in this regard.

immediately after she got into the minivan, Mr. Hopper Jr. took her phone, giving it back to her only when directing her to make calls to family members to assure them that she had not been kidnapped. (Doc. 252 at 90-92).

The plausibility of Melissa's testimony regarding her son's reaction to seeing his mother in handcuffs, the resolution of conflicts in Melissa and Mr. Hopper Jr.'s testimony (to the extent that their testimony conflicted), and the ultimate determination of whether Melissa was, in fact, a "kidnap victim" remain the exclusive province of the jury. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (stating that it is the "responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inference from basic to ultimate facts."). The jury's verdict in this case reflects its resolution of conflicts in the evidence in a manner inconsistent with Ms. Hopper's assertion of her innocence, and the Court will not, at this stage of the proceedings, evaluate the credibility of the witnesses or reweigh the evidence. *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996) (recognizing that in the habeas context, "[t]he Court may not weigh conflicting evidence nor consider the credibility of witnesses"). Instead, the Court "must accept the jury's resolution of the evidence as long as it is within the bounds of reason," *id.*; and here, viewing the totality of the evidence presented at trial in the light most favorable to the prosecution, the jury's verdict was well within the bounds of reason.[10] *See Jackson*, 443 U.S. at 319 ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence*

---

[10] As previously discussed, viewing the evidence of record in the light most favorable to the prosecution, the jury's verdict was amply supported by evidence that the Hoppers (including Defendant) conspired to, and then did in fact, kidnap Melissa; that she was handcuffed in the minivan; and that Mr. Hopper Jr. took her phone away from her, but allowed her (or forced her) to make some phone calls—including at least one call from Deming which ultimately led police to the Hoppers' property.

is to be considered in the light most favorable to the prosecution."). Ms. Hopper's arguments to the contrary do not warrant habeas relief.

**IV.**    <u>Conclusion</u>

For all of the foregoing reasons, the Court proposes to find that the Motion, exhibits, and record conclusively establish that Defendant is not entitled to the relief she seeks. Consequently, the undersigned recommends that the Court **DENY** Defendant/Petitioner Polly Hopper's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.


_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE


---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---